Case number 18-7151. Michelle Thompson, personal representative of the estate of James Alley Thompson Jr. Appellant v. District of Columbia et al. Mr. Saul for the appellant, Ms. Wilson for the affidavit. Good morning, Your Honors. May it please the Court, I'm Micah Saub representing the estate of James Thompson. I'm joined here today by Michelle Thompson in the front row behind me. I'd like to reserve four minutes for rebuttal. Your Honors, the District of Columbia must be held responsible when it empowers an employee with complete and unreviewable authority and the employee uses that authority to cause constitutional harm. Here, the District gave Frederick King plenary power to conduct a reduction in force free from any oversight or review. He used that power to engineer the firing of an employee whose complaints about fraud, waste, and abuse in the government angered Mr. King. Fundamentally, Mr. King used his policymaking authority to harm Mr. Thompson. The District of Columbia is therefore liable. That makes several statements there that have been challenged by the District of Columbia in the briefing, but the most, I think, important and fundamental one in my view is the decision to transfer Mr. Thompson from his position to another position that would be eliminated in the reduction in force. The District contends that that decision, and we've held in prior cases, that that decision was tantamount to a termination that was governed by the CMPA, in that he is not the, I guess, final authority or the decision maker with respect to the CMPA. So what is your response to that? Judge Wilkins, I can ignore that fact entirely. I don't mean ignore it, but I don't need to challenge the factual accuracy of that, though I do, because it doesn't matter. Monell is not about focusing on non-governmental causes. So what we have here are a combination of causative events. We have governmental action, Mr. King in his final policymaker authority dies, hat, creating the reduction in force list, the RIF list, putting the vacant position on that list, and then later effectuating the RIF, right? So he clearly, it's undisputed, that he acted in his final policymaker capacity. But for someone to get on the RIF list, they have to be placed in the position that is to be RIFed. Right. But the Supreme Court in Monell was not focused on what everybody else did. Like when we're talking to our children, they do something wrong, and they say, no, no, no, it wasn't my fault, he started it, right? What do we say? It's not about what he did. We're not talking about that right now. What we're talking about is what you did. Here, Monell, the court is focused on what the government did wrong. It doesn't matter. The government here is Mr. King. I'm sorry? The government here is Mr. King, though, right? Correct. And so the government, Mr. King, did several events which caused the outcome. One of them is transferring him to or reclassifying him to another position. Right. And so in Monell, the court held that when the government is the, I don't know why this phrase always sort of runs out of my head, the moving force. I know why it comes out of my head, the moving force. I don't know what moving force means. This court has explained repeatedly that it means proximate cause. And there's nothing about proximate cause, Your Honor, that disallows more than one. I don't think that, or I don't understand, and he can correct me, I don't understand Judge Wilkins' question to be talking about multiple causation. I take him to be pointing out that Mr. King corrected the title, ostensibly, of the job that Mr. Thompson held, and that that was the action that caused the termination. And do we know whether he was final policymaker on that, and or whether the CMPA governed that? And one of my questions for you in that regard was, there were some administrative appeals that Mr. Thompson filed, and they were withdrawn, and I'm not sure, can you explain what those concerned and why they were withdrawn? Yes, the appeal related, and parenthetically this was addressed by Thompson III, the appeals related solely to the reduction in force. I've been litigating this case for a very long time. I remember quite well the administrative judge said, we're not talking about anything other than the reduction in force. And when it became clear that the issue that's now before this court was outside of the purview of the administrative appeal, there was no utility to pursuing it. But was the transfer part of that administrative review? No, no, no. The OEA, the Office of Administrative Appeals, the judge was absolutely adamant that that would not be included in the appeal. No, no, that's not my question, sir. My question is, did you challenge the transfer before the administrative judge, and then the administrative judge said, no, I don't have jurisdiction to adjudicate the correctness or propriety of that transfer? Yes, we tried to challenge. Where is that in the record? Oh, I'm sorry. Your case hinges on that. Respectfully, no, Your Honor. In my view. Your Honor, first of all, that issue was addressed in Thompson 3. I believe that that issue is not the issue here. How was it addressed in Thompson 3 such that we shouldn't care about it? The issue following Thompson 3 was limited to whether Monell, the only question that remained in the case, was whether Monell created a shield for the District of Columbia. And in that regard, it doesn't matter, well, none of these other aspects of the case matter. Monell turns on not whether there are multiple causative events. In Bryan County, there were both governmental and non-governmental causative events. But despite that, the court still permitted liability, because Monell does not limit liability to circumstances in which the government is the sole wrongdoer. But Mr. King is the person who transferred Thompson to the RIF position, and he is a governmental actor. Yes. So that's not a non-governmental event. Well, the transfer is non-governmental in the sense that it was not performed, at least according to the argument of the defendants, by a final policymaker. So it is still governmental, but it's not final policymaker action. Then that means that's the whole point, is to, if it's performed by someone who is not the final policymaker, then why isn't that fatal to you under the Monell jurisprudence? Because Monell does not focus solely on whether there are, in fact, Monell doesn't focus on whether there are non-final policymaker actions. The focus of Monell is whether there are final policymaker actions and whether those are causative in the language of Monell, right? The Ninth Circuit explained, and I don't think that this Court has addressed the sort of concurrent causes problem that we're discussing. But the Ninth Circuit wrote in Jones v. Williams, the conduct of two or more persons can operate at the same time, either independently or together, to cause injury or damage. And in such a case, each may be a proximate cause. Mr. Zeldin, I am having trouble understanding why you're focusing on multiple causation. We're talking about whether Mr. King is the final policymaker for the relevant action here or not. And, right? Well, yes, but when we're talking about the relevant action, we don't want to fall into the trap that the district has laid for us of assuming that the relevant action is just the transfer. That transfer... There wasn't a transfer. There was a reclassification of positions. Oh, no, no, Your Honor. Well, I think it... I mean, I think there's actually a lot of rides on that because CMPA covers transfers. I'm not sure that it does cover classification of positions, but be that as it may, the move that was made to take Thompson from a job where he had job security into a job that was RIF, whatever you want to call that, the question is, did King have final policymaking authority over that? Is that not the question? It is not, Your Honor. I seem out of time, but if the court will... You can keep answering questions as long as we have them. The... Excuse me. I have a cold. Proximate cause is not concerned solely with the immediate direct cause. When we look at proximate cause, whether we use a but-for standard, whether we use the substantial factor standard, we look at all the causative events. The transfer into the doomed position would have been meaningless but for the fact that the very day before, Mr. King had slated that position for elimination. Mr. King knew what he was doing and intended the outcome. In PEMBAR, the Supreme Court held that when the policymaker intends an action, I beg your pardon, I think I'm talking about Bryan County, Bryan County versus Brown. When the policymaker intentionally deprives somebody of a federally protected right, proximate cause is established. The action does not have to be the fatal blow. There has to be proximate cause. Monell says there has to be... The governmental action has to be the moving force. This court in multiple cases, Monroe versus D.C. being one of them, said that by moving force, the Supreme Court means there has to be proximate cause. So as to... I'm not sure why you're so afraid of the middle step. First of all, our remand was to look for... Ask whether Monell applied to the personnel decisions, plural, not a single personnel decision. So that's consistent with your... We look at the whole picture of how this happened, generally referred to as three steps. Now if, in looking at that second step, it's a reclassification as it was originally characterized, is there any question that King was the final policymaker as to reclassifications? From my perspective, no. Has the district argued that the CMPA applies to reclassifications? That's interesting, Your Honor, no. Okay. Now, if it's a transfer. We found in our prior opinion that Mr. King was transferring people around as part of implementing this RIF. And so that he was the final policymaker as to transfers in implementing the RIF. Now the transfers there were to protect people. I don't know why it would be any different if it was a transfer to harm somebody. And so as to that transfer, if it's a RIF implementation transfer, was he not the final policymaker? He was. Then why are you running away from this? You've got him creating the spot. You've got him either reclassifying or transferring as implementing the RIF. And then you've got him executing the RIF. I don't understand why you spend so much time trying to avoid that. I suppose I might have just sort of fallen into that trail, Your Honor. We argued in our brief that Mr. King was the final policymaker as to all three steps. But we thought that perhaps we could sidestep the debate that we would have with our colleague over whether Mr. King was the final policymaker as to step two, the transfer slash reclassification. And so we don't need to get into that because prompts or trials analysis. We're supposed to look at whether this collection of personnel decisions, which everyone has broken into three steps, collectively, he was final policymaker as to. And if he certainly was as to one, as to three, nobody's debated that. The question is just how do you look at that second step? If it's a reclassification, he's final policymaker. If it's a transfer and implementing the RIF, he's a final policymaker. If it's an ordinary routine transfer independent of the RIF, maybe that would be in CMPA land where there would be a more substantial question. But I guess my question to you is, was it an ordinary transfer or was it a RIF implementing transfer like the other ones referenced in Thompson 3? It was clearly a transfer related to the RIF. Now, one can argue that a reduction in force is about eliminating positions, not personnel. That was not the case at the lottery. We found in Thompson 3, not found, we held in Thompson 3 that on the record, he was moving people around as part of implementing this RIF. That's correct, Your Honor. And so in that regard, to the extent that transferring Mr. Thompson into the doomed position was part of the RIF, as we have contended from day one, then yes, Mr. King was acting according to his final policymaking ability in doing the transfer. The question as to whether or not he's a policy, final policymaker is a legal question. So what law, regulation, statute are you pointing to to support the contention that he was the final policymaker as to transfers or reclassification? The 1645, there was a special law that was passed at the behest of the financial control board. You're probably too young to remember that, Your Honor. I dealt with all of that. I litigated all of it. The control board required that there be a reduction in force. The D.C. Council complied by passing this law that allowed for the reduction in forces at various agencies to happen by command of the agency head with zero involvement, zero appellate rights. I don't recall that statute saying anything about classifications, reclassifications, transfers. No, it didn't. I don't think that it atomized the decision-making associated with the reduction in force so narrowly, but I don't think it has to have done in order to empower Mr. King to act with final policymaker authority. If that were the case, then it seems like Thompson III would have so held. There was a remand for a purpose. Respectfully, Your Honor, I think Thompson III was pretty clear. Judge Griffith wrote what seemed to me a rather long opinion explaining that Monell was no problem for Mr. Thompson. Judge Leon not only went in a different direction but effectively ignored this court. I don't think that Thompson III really left very many questions. Under Thompson III, we prevail in Monell. Well, I think we were pretty serious when we say to remand something for briefing. I think the opinion flagged concerns that would need to be addressed, but we don't remand for meaningless exercises. I understand that. The district court judge did the job we asked here, and the question is how do we deal with this sort of thorny situation of at least this middle step in these collective personnel decisions that we're trying to decide whether those three collective steps were what their status was under Monell? Your Honor, I believe that the district judge could have written a better decision that would have been more helpful to this panel had he given some weight to the panel to the Thompson III guidance. That being the case, the case being what it is, I can tell you that the parties certainly took it very seriously, and we addressed it very seriously and argued there. We argued that Mr. King was a final policymaker as to all three steps, but we also take the view that it is conceptually incorrect to assume or to take the position that each step, each causative event must be caused by the government in its final policymaker guise. I'm not going to go back into that point. Does the CMPA apply to internal agency reclassifications? This was described as a, described by Mr. King as a correction of the position title. Does the CMPA apply to that? Put aside the legal conclusion that what happened from these three steps was a constructive removal, but if we just look, the district court was looking at steps in isolation, so if we just look at reclassification, does the CMPA apply? I don't think so. I do not believe that. Do you know whether it applies to an internal agency transfer where, for the time he was still there, put aside again the constructive removal part, he didn't have a change in job responsibilities pay? Correct. And I believe that the answer to that is no. In fact, it was so little change that Mr. Thompson was unaware of it. He didn't know that. What made the CMPA applicable was that, in fact, it was, as a matter of law, if not factual action by Mr. King, a constructive removal, and of course the CMPA applies to it. That's right. That's right. But the fact that this court found in Thompson 2 that it was a constructive termination does not direct Thompson 4's outcome. Because there are different analyses. There are different questions. Context matters. And so while the constructive termination effectuated by the transfer was central, when we were looking at the moment in time at which appellate or sort of, you know, internal appeal rights would have been triggered, that's not the analysis in the Monell context. In the Monell context, as you've noted, Judge Millett, we look much more holistically. We look at the entire course of events. We have to look at the relevant action. It's just that we describe that relevant action as a collection of personnel decisions, not the single personnel decision. Correct, Your Honor. And I think you answered this question, but just to make sure that I understand what you said. In pursuing and then abandoning an administrative challenge to the termination in the RIF, did Mr. Thompson make any argument that to the extent that the law authorizing the RIF eliminated any process rights, that that was a due process violation in and of itself as applied? I'm sorry, Judge Millett, can you repeat that question? Pillard. I'm sorry. That to the extent that Mr. Thompson was RIF'd and that the RIF legislation says there are no rights attending the RIF, was there any claim and could there have been any claim that taking away those rights with respect to non-at-will employees was itself a due process violation as applied to those employees? That is an interesting and big question, Your Honor. I think that sort of the easy answer is, hey, the government, the state government, district government, gets to decide what process is allotted to people. Due process is not that you get a hearing. It's that you get whatever the government says you get. If we step back, maybe push a little bit harder, we may well say, gosh, here's a guy who has worked for, and I'm just thinking about Mr. Thompson, but this is true generally, right? Worked for the government for 20 years. He's been at lottery for a decade. Enjoying civil service rights. And now the law changes to deprive him of those rights. I do not believe that we, you know, forgive me, I think, I don't know whether we made the argument that the law, the underlying law was itself improper. At least as applied to someone in a position like Mr. Thompson. Correct. At least as applied. Speaking more broadly, I think there are lots of circumstances where it would be fine. But as applied in Mr. Thompson's case, perhaps we might have been able to make that argument. I don't think that's an argument the OEA ever would have entertained. But because it's a much bigger question. But to be sure, it was changing the ground rules for Mr. Thompson. All right. Thank you. Thank you, Judge. We will allow you some time for rebuttal. Good morning. And if it pleases the Court, I'm Mary Wilson representing the District of Columbia. The plaintiff has failed to carry his burden to show the District's direct liability for the due process violation here. Judge Millett, in Thompson 3, the Court said, for our purposes it is the substance of a constructive termination and not the semantics of a transfer or a reclassification that matters in determining whether Thompson was deprived of his property interest in his job. If it was a mere transfer or a mere reclassification, he had no property interest in that. He has a property interest in a due process violation. We did remand to address whether personnel decisions collectively, plural, not singular. Yes. We can't just carve out one step. But even looking at the totality of the circumstances here, Mr. Thompson has long ago conceded in this case that the RIF was not illegitimate, that the RIF was legal. That's in Thompson 2. It was clear in his argument in Thompson 3, if you listen to the case, especially his rebuttal. The RIF was not illegal. The RIF was not the basis of his claim here. The due process claim arises from the deprivation of fair procedures. He was denied fair procedures when he was constructively terminated. The CMPA says if you are terminated, you get procedures. I understand, but I guess constructive removal is the label for the three, I'm going to call it the three personnel decisions, plural, that led to this outcome. That's what was a constructive removal. If he had been transferred, but that position had just, or reclassified, whatever you want to call it, and that position had not been RIF'd, the third step, there would have been no constructive removal. You would agree with that. It takes all three steps to have the constructive removal. It's just that the transfer, knowing what had happened before and knowing the third step that was coming, transferring someone into a doomed position, that is step three, is what becomes a constructive removal. The transfer by itself without that third step is not into a doomed position or a constructive removal. It has to be a doomed position. That's what we said was a constructive removal, was transferred to a doomed position. It wasn't doomed unless it was and actually was RIF'd. But it's really a two-step process, because Mr. King designated the position to be RIF'd one day, and then the next day transferred, reclassified, or constructively terminated. No, no. He transferred him in. I don't know how you get out of three steps. You actually have to have, if he had then decided on day three, wait a minute, I'm taking that position out of the RIF, then it wouldn't have mattered. So you have to have all three steps. There are certainly steps two and three. Yes. Put him in and then eliminate the position. The RIF itself was legal. Mr. King had authority to designate a position to be RIF'd. Designating this position to be RIF'd did not implicate a property interest and did not deny Mr. Thompson of any protected property interest. The property interest that creates the due process claim that keeps us here in this case was the, was, I mean, Thompson does not argue that his RIF was illegitimate. Rather, his claim is he was transferred to one of the positions scheduled for elimination as a mere- The doomed position. And the claim arises at the time of the protectural action. This is Thompson 2. The claim arises his protectural transfer to the doomed position. That is- Only if we know the ending. Would you agree that if, in fact, step three had never happened, if on the, after the, the day after he moves Mr. King into this position, I'm sorry, Mr. Thompson into this position, if on the third day Mr. King had said, wait a minute, I don't want to eliminate that position. We need a security officer. I was just reclassifying him. And so removed that position into which he'd been moved from the RIF list. Then you would have no damages. No, no. Would you have a constructive removal? Well, Thompson 2 says the constructive removal was at the time- Would you have- The transfer to the doomed position. Assuming that the doomed position was doomed. And so that statement incorporates step three by hypothesis. It's a description focusing on step two, but it incorporates what Judge Millett was referring to as step three. The doomed position. That's where you get the adjective doomed. Yes. The other question I had about the CMPA is I get that it applies to removals. And we certainly recognize that he had a property interest in his position prior to the at-will statute being enacted. But it seemed very odd to me in your brief to sort of say this was human resources job, because when you talk about constructive removals, nobody sends a memo to human resources that says wink, wink, nod, nod. This transfer, this reclassification, it's a constructive removal. You better apply your procedures. Right? What happens with constructive removals is you don't get procedures until after the fact. I think that makes sense, Your Honor. That Mr. King knew it was a constructive removal. Mr. King was bound to follow the CMPA. Mr. King was the personnel authority who had to make sure. Sorry. So Mr. King was a final policymaker as to identifying the RIF. I'm just going through this one at the same time. Identifying the RIF, the first step, identifying positions for the RIF, the first step. Identifying positions to be RIF, he was a final policymaker. He had absolute discretion to identify positions to be eliminated. Right. So he was a final policymaker. And he concedes that the RIF itself was legal. He was a final policymaker. I'm going to keep asking my question. King was a final policymaker. It doesn't matter, Your Honor. It matters to me. So as to the first step, do you dispute that King was the final policymaker on identifying positions for RIF? The statute gave him absolute discretion to pick positions. I'm going to ask it again. Do you dispute? With limited review. Do you dispute? So do you dispute or not? I didn't see this anywhere in your brief. Do you dispute that as to identification of positions for RIF, he was a final policymaker? Did you argue that in district court or here? He probably was. But it doesn't matter. Did you argue that in district court or here? I'll decide what matters to me. I don't think it matters. I'll decide what matters to me. So I'm just trying to get. I'm trying to. I'm sorry. I want to be fair to you about what your position is. And so maybe it's easier to say you did not dispute. We did not. In the district court or here that as to step one, identifying positions for RIF, he was the final policymaker. But as to the RIF, he was not bound by the CMPA. RIF was outside the CMPA. The CMPA rates do not apply to the RIF. The RIF was legal to the extent he had unlimited discretion and was a policymaker as to the RIF. It doesn't matter. Because he was denied fair procedure. That's not when he was denied fair procedures. He wasn't denied fair procedures at the RIF. He was denied fair procedures when, as Thompson 2 said, and this court agreed in Thompson 3, at the time of the contextual action. But let me ask this question. Let's suppose he had not been transferred to a position that was RIF. He was just reclassified to some other position. But he didn't like that position. Would he have the ability to challenge that reclassification pursuant to the CMPA? If there was no demotion and no reduction in salary, not that I know of, no. So explain to me how is it then that, and so in that sense, that reclassification, King would be the final policymaker. Well, as, we would not be here. The court would not have said that. I don't care whether we would be here or not. I'm asking you a question, and I want you to answer it. Could you repeat the question, please? In a circumstance where an employee were transferred or reclassified by King in 1996, and there was not, that new position was not subject to a RIF, but the employee just didn't like being reclassified or transferred, would they have had any rights under the CMPA to challenge that? Not that I know of, no. If the transfer is not a demotion, a constructive, if it's not a constructive termination, no. And so in that sense, King taking that action would be the final policymaker under the rubric of MONET. Well, he was still subject, he was still subject to review by the board. The board still had to review. He was not a final policymaker because his authority was tempered by supervision by the board. And also, any action could be reviewed at OEA. So as a proponent for the state that the city has formed an independent adjudicative body to review potentially illegal personnel decisions, then the decision-maker is not the ultimate policymaker. I'm not sure I follow that second part, because my understanding was that the OEA is the body that applies the CMPA. And so if it's something where there's no CMPA rights, what would he bring as a legal matter to the OEA? If it was merely reclassification that was not illegal, he has no deprivation of any property interests and nothing to challenge. The deprivation of the property interest here comes because everything amounted to a constructive termination. If you take out the three pieces and mention the property interest... The deprivation of the property interest triggers the due process clause, but I had thought the CMPA applied to certain actions, and I thought your answer was it doesn't apply to a reclassification that does not... unless that in its own operation changes benefits, pay, grades, status. The things listed in the statute, correct? The same for an internal agency transfer. Yes, but if you take each three steps here, and none of the three steps designating him to be RIFT, that doesn't implicate... designating a particular position to be RIFT, that doesn't implicate a property interest. Transferring him to another... or reclassifying his position, that doesn't implicate a property interest. Or actually effectuating the RIFT... Does the CMPA apply just if someone shows they have a property interest? I didn't read the CMPA as a... the due process clause requires a property interest. His property interest arises here because he was a career employee who could be fired only for cause. So your last appeal here, which was after we had found a constructive removal, so the constructive removal had been found in your last appeal here, you, the district employee, I don't remember who argued him, but continued to argue that he had no due process rights, notwithstanding that it was constructive removal. So I don't know how you can say an illegal reclassification triggers the CMPA. Your position last time you were here was that the CMPA was not triggered, even though we had already held that it was a constructive removal. So what was your rationale last time for why the CMPA didn't apply to this constructive removal? I think our argument has always been that the CMPA did apply to it. No, you most certainly did not. You could argue we had held in Thompson 2 that there was a constructive removal, correct? Yes. And in your last argument, your last case, Thompson 3, you were still arguing that he was not entitled to process. I think we had an argument in Thompson 3 that any lack of process was harmless because he went to the OEA and affirmatively withdrew his... I thought your argument about why he was not entitled to any process was because the RIF legislation took it away. And if it's under the RIF, no process. There is no process to challenge the designation of a particular position to be RIF. The CMPA... But if you are an employee with a property interest in your job and you're subject to the RIF, you do have CMPA rights? No, no. That's what I understood to be your position. The RIF is specifically outside the confines of the CMPA. The RIF statute itself says notwithstanding any other provision of law. And the CMPA regs say they do not apply to RIFs. All right. So I thought that's your answer to Judge Millett's question. Here's from Thompson 3. Correcting this error, that was a classification error, the district argues, is not a transfer that triggers any process. That's Thompson 344... Your Honor, I'd have to go back and look at the full paragraph. I think we have consistently argued, and I argued in Thompson 3, that he has not satisfied his burden under Monell because Mr. King was bound to follow the CMPA. We argued Mr. King was bound to follow the CMPA, and to the extent his transfer amounted to a constructive discharge, he had to follow the CMPA. Okay, so I'm just reading from our decision in Thompson 3 where you said it was just correcting a classification error and no process was due, even though he had already held that that correction of the classification error was a constructive removal. I don't know about that isolated sentence. Our brief in Thompson 3 is clear that the CMPA... Because that's why the court discusses the CMPA. The court said the district's argument, it uses the word persuasive, the district's argument that he had to provide for procedures under the CMPA would be persuasive, but for, then the court went on to consider other considerations, which I think after a full briefing and remand on this record, that it's clear the CMPA requires process. He has... We are in this case because the CMPA created a property interest in his job, and he could not... Has someone ever taken a constructive removal case to the OEA or to the CMPA? Yes, that's a good... How do they... Is it after they're removed? Yes, there's... So there's nothing that human resources should have stepped in to do to prevent his removal or to give him process before removal. Constructive removal always happens afterwards because it's the plaintiff that labels it a constructive removal, and usually the employer says, no, you weren't removed. I assume Mr. King would have disputed that it was a constructive removal when he was transferred in to this position? We classify it transferred? Yes, that's what he has said throughout this litigation. That the constructive transfer came at the time of the... No, no, I'm asking... The constructive termination. I'm asking a separate question. Did Mr. King agree when he made this reclassification-slash-transfer that it was a constructive removal? At the time he did it, did he think it was a removal? When he was... Did he agree that it was a removal of government? Did he understand what he was doing to be a removal governed by the CMPA? If you listen to the argument in terms of... He said... Mr. Saab says in his rebuttal, the RIF is not part of this case. No, I'm asking... I'm sorry, I apologize. I might be getting people... I was asking Mr. King's view at the time. Mr. King made this reclassification decision. Did he acknowledge, at least internally, maybe not to Mr. Thompson, that it was a removal that triggered the CMPA? That this Court has held that it was, but... Right. That's a legal conclusion. But I don't know if Mr. King will ever acknowledge it. Right. And in Thompson 3, we talked about Mr. King having... As part of his RIF authority, he was moving a lot of people around, generally to protect people from the RIF. Correct? I mean, we said that in the opinion. Yes. I didn't hear you disputing that in the District Court or here. And so, transferring people around to protect them from the RIF, was that part of his authority under the RIF? I hadn't heard... No, it was not a part of his authority under the RIF. Have you disputed before the District Court or this Court that that was part of his authority under the RIF? The only authority he had under the RIF was to designate positions to be eliminated. That is the only authority he had. Well, we indicated in raising questions for the District Court to consider under Monell, that it should consider, apart from the word of the statute, the fact that Mr. King was moving people around. I take that to be transfers. Maybe it was reclassifications. To protect them from the RIF. And I didn't understand that that was part of his authority in implementing the RIF. Whether it was conferred by the statute or something that he simply acquired by practice, that that was something he was doing. And you haven't disputed for the District Court or this Court that he was doing that for other people. Have you? I don't... I don't think we've disputed that, but I think if... The case I was trying to find the name of is Levitt. Levitt is the site in the number. D.C. Court of Appeals said that if you, in this exact kind of position, put factual circumstances. It was a RIF case, but the RIF was irregular. The person had been moved into the position, or the position had been created for them, and then it had been RIFed. And the D.C. Court of Appeals says there, even though OEA is just... That there's limited review of RIFs. If you make a good faith proffer that the RIF was irregular and amounted to a constructive termination, rather than a designation of a position. I think what they held there was on the particular facts and circumstances of that case, the dismissal without allowing discovery was premature. That's all they held. Yes, but the allegation was, they didn't decide it on the merits, but the allegation was, if you allege that it's not just that the position I occupied was RIF, it's that there was some kind of ruse or pretext so that I was constructively terminated, the OEA can consider that. Well, they said that OEA can, the OEA, that it's at least a non-frivolous argument that allows you to pursue discovery before the OEA. They didn't say that that means that reclassification or transfer is governed by the CMPA. It was a non-frivolous argument that it was governed, I think is what they found. But OEA could say, if this amended to a constructive transfer, you were entitled to a hearing. Well, that raises a question for me because there were hundreds if not thousands of people who were RIF'd, undoubtedly during that time period, the 96, 97 time period, and undoubtedly some of them were transferred into or reclassified into a position that was subsequently RIF'd. During that time period, what position did the District of Columbia take when any of those, if any of those were challenged before the OEA? Did the District of Columbia take the position that reclassification or transfer was governed by the CMPA? I think the District takes the position that the council created the OEA to unravel illegal personnel actions and trusted OEA to unravel whether these were legitimate RIFs or some kind of sham terminations. And in Proponent, the court said, if the government has created an independent board to review personnel mistakes, then that is the policymaking. It is not the policymaking of the individual decision-makers who make the mistake. When they are, when they're, I mean, the bottom line here is that Mr. I'm just curious why in Thompson 3, after we'd found the constructive removal, you weren't arguing that the place to address that improper, unlawful reclassification was the CMPA process. Well, we definitely argued in this case that, and if there's a process. If there's CMPA protections, or if there's process that he was due, then there's a MNL. But, Your Honor, if you have three individual moves, none of which implicate a property interest, but the totality is a constructive transfer, then the CMPA applies. Constructive removal. Constructive removal. If you have, he designated a position to be RIF'd, he moved Mr. Thompson into that RIF'd position, and then the RIF took place. None of those individual actions implicate a property interest. He has a property interest protected by due process in this case because he lost his job. If you're going to look at it as a reclassification, designation of the position, and effectuation of the RIF, he has no property interest. Why is that? Why is that? I mean, if this goes to the question I asked Mr. Saub, which maybe is more appropriately directed to you, why isn't the application of a RIF to someone who has a property interest in their job something that would trigger, at least as applied to such a person, a due process? Because the property interest is created by the CMPA. The CMPA says you can't be fired for that clause. So the property interest for constitutional purposes is created by that state law. But the CMPA itself says it doesn't apply to RIFs. And the RIF statute at issue here itself says notwithstanding any other provision of law. So the RIF law takes designating positions outside of the CMPA that creates the property interest. So when you are RIF'd, it does not... But he had a property interest in part because, and this gets to sort of reality on the ground, he had the kind of job that I think a reasonable government professional would think, this isn't going to be RIF'd because this is a necessary function. Even when we get down to bare bones in financial exigency, this position is going to be here. And, in fact, it did continue to be there after Mr. Thompson was removed, the security officer position, security systems administrator position. So I guess the question is where and how does the property interest evaporate? And I guess you're saying, well, it evaporates as soon as it's encompassed within the RIF. Because the RIF is something that is the property interest goes up to and does not combat against a RIF. It combats against firing. It combats against transfer. It combats against demotion. But it doesn't protect against RIF. Yes. Precisely. And if you take someone who's in a non-RIF position, there's no argument that his original position was going to be RIF'd. He was in that position. He had a property interest in his career service. He had a property interest in his job. And what triggered the concerns here was that they had this RIF going here, that they had the authority to go, and they picked him up, plucked him out of his position that had a protected property interest, and threw him in to the RIF wanting to go, ah, no property interest. That's not how this works. If he was only RIF'd, no property interest was implicated. If all of these actions amount to a constructional- But his original position was not RIF'd. His original security office. If all of these facts taken together amount to a constructive transfer, if Mr. King put these actions together to effectively terminate him, that's what implicated the property interest. That's why Thompson, too, says there's a property interest. That's why we're still here in this case, because he was denied a constitutional property interest. If he was just RIF'd, there was no property interest. It's the- No, but that's the point. It's that the collective personnel decisions that were manipulated to deprive him of his property interest all happened to be, if those three steps were ones that were in their nature, put aside the fact that you couldn't shove Mr. Thompson into this program, but in the nature of their actions were the types of things that he had the authority to do, then it seems to me the government doesn't get out of Monell by saying, well, everything he did he had the final independent authority to do, but because it turns out to be illegal as applied to him, he's not the final policymaker. I don't think that's how Monell works. He was a final policymaker on all three steps. Right. Monell says that the district has to be responsible for the constitutional deprivation. Mr. King effectuated a constitutional deprivation by effectively terminating him. He lost his property interest to this guy. But someone's a final policymaker, and they abuse their authority. Yes. The state's still liable. When a final policymaker abuses their authority, otherwise final policymakers would never be responsible for anything, because as soon as they cross the line of illegality, we go, well, they weren't allowed to do that. Your Honor, I go back to the opening quote from Thompson 3, that this is semantics. Whether you call it a transfer or reclassification, that in isolation doesn't implicate a property interest or warrant process. The totality of the circumstances here deprived him of his property interest in this job. Okay. I think we're, at least where I believe we're talking crosswise with each other, is that determining whether there's a property interest doesn't answer the question as to whether or not he is the final policymaker. So in other words, if there were three steps that were taken to effectuate determination, and if we believe that he is the final policymaker as to each of those three steps, then, or let me put it this way, if there were no CMPA rights as to each of those three steps individually, is there any authority that you can cite to me from the OEA or from the D.C. Superior Court, the D.C. Court of Appeals, or our court, that says that a constructive termination is governed by the CMPA, even if the individual acts that made up that constructive termination were not? The CMPA says that a person cannot be terminated without hearing and notice. Here... Determination was the RIF, though. But the RIF was legal. The RIF was legal. And the RIF wasn't governed by the CMPA, right? If we were here only as to the RIF, he would not have a due process clause, and we would have won in Thompson 2. He would not have a property interest, and we would have won in Thompson 2. If only the RIF was at issue, we would have won in Thompson 2. The CMPA said that personnel authorities had to follow it. The Lottery Board enacting statute said that the executive director was bound to follow the CMPA. He may have labeled this to try to dodge the CMPA, but that does not make that the decision of the District of Columbia. That makes his decision a rogue decision outside the confines. And I just want to say, one might feel great sympathy for Mr. Thompson here, who has been fighting this case and now his children for over 20 years. I certainly do. But we raised him a no defense in 1997 in our answer and in every pleading thereafter. He made litigation choices to abandon his case to OEA, to not pursue an individual case before against Mr. King. Thompson, I think it's one, reflects that he named King and then didn't serve him or abandon that. He made litigation choices that could have reinstated him to his job years ago. So the District of Columbia's position that he could have sued Mr. King individually? Yes. For actions that he took in his official capacity? He might have immunity defenses, but people sue individuals all the time. In Triplett, in Singletary, where the plaintiff served years in prison following a non-constitutional parole replication, the court said that was not the board's policy, that that was the district's policy, because the district said that the board cannot revoke parole without due process. So too here, the district has said that individual personnel authorities cannot deprive people of their jobs without a hearing and notice. And he violated that policy. Mr. King violated that policy here. He did not. Is it your position, then, that if someone is a final policymaker as to the relevant actions? What was the beginning? Sorry. If someone is a final policymaker as to the relevant actions that harmed somebody? If they're sued in their official capacity. Can I just finish a sentence?  But they were able to cause a harm because they exercised the powers that they have as final policymaker unlawfully. Is it your position that Monell absolves the district of responsibility? No. It's the district's position that the plaintiff has an alternative route to sue the individual in his individual capacity. Well, that's not, in this case, you haven't argued that here. No, I'm saying you could have. We're only talking about Monell liability here. Mr. Thompson could have sued. Maybe could, maybe couldn't have, but we're only talking about Monell liability. But one of the reasons we're here so many years later is he didn't sue Mr. King in his individual capacity, and he abandoned his claim before OEA. I thought you said he wouldn't have a claim before OEA. What was he supposed to pursue to OEA? I thought OEA is so sad. He has no claim for the reclassification that he can bring to OEA. The record shows that his, and as for firing in the RIF, that he could bring to OEA. He has no claim that the job into which he was reclassified was designated for the RIF. What's your position? As I think Mr. Saul conceded today, and I think it's record document 125 shows the OEA documents are in the record. He argued to OEA that it was a scam. It was a sham RIF that he had been illegally transferred. He argued that he had been illegally transferred into the doomed position and then RIF, and that he made this argument to OEA. It seems like nobody is seriously disputing that he made that argument, or indeed that it accurately described at some level what happened. But I'm interested in your position because I had thought that you had said, as the position of the judiciary as a legal matter, he has no OEA claim either for the reclassification or, well I'm talking about for what happened here, and I think that's coherent at least that he has no OEA for the reclassification and he has no OEA for a termination in the RIF. I thought that was your position, and I don't think... Taking individually isolated, but if his argument is as it was, that those two things together were a ruse, a scam RIF, then under Leavitt and this Court's earlier decision in Fitzgerald, he can argue to OEA that I wasn't RIF'd, I was really terminated. I wasn't RIF'd. He could have gone to OEA and said I wasn't RIF'd, I was really terminated, and here my claim. So just in closing, Mr. King was constrained by the CMPA. If he was going to fire someone, he had to provide them a process that complies with constitutional due process. And even if you take it down into the individual steps here, we're talking semantics, it amounted to a termination. He was terminated, and Mr. King was bound under the CMPA to give him a hearing and notice before he was terminated. Thank you. I think Mr. Shelf did not have any time left. We'll give you two minutes. That was very nice of the judge. Thank you. The scenario the defendant describes allows the clever defendant to avoid review. Justice Brennan was adamant in Propatnick that you have to look at the realities of municipal decision-making. He did not want there to be the kind of discussion that we are having now, which is sort of like when you look at these minuscule details to determine, well, we can avoid liability under this category, and then we avoid liability here. We avoid liability here, and we avoid liability here. The fundamental reality, the real reality on the ground, is that Mr. Thompson had no OEA appeal rights. The judge was very clear, not interested. Is it possible that the judge was wrong? Yeah. Of course. Anything is possible. Mr. Thompson realized that though he had named Mr. King personally as a defendant, that he had no viable claim because Mr. King was acting in his official capacity. And so, or as a government decision... Could he not be sued? Well, anybody can be sued, but he would not have liability. He would not have a viable lawsuit. He would not have been a viable claim. Why not? They say it would have been. I don't know that they actually say that it would have been, but... What they might say is he might have immunities, but that doesn't mean you don't have a claim. There certainly would not have been... So no substitution statute, the district does not substitute itself when its officials are sued in their official capacity? Yes, and there are countless cases where, you know, this court will drop a footnote saying so-and-so was sued, but clearly it's in their official capacity, so, you know, we're recognizing it that way. Because when you work for the government, the government is going to be responsible. If he's sued in his official capacity, would you still have to meet Monell? If he were... If you were sued in his official capacity, it would be identical to suing the agency. When you sue somebody in their official capacity, you are suing the agency. Mr. Thompson had no rights under the CMPA. He didn't... Go ahead. He had no rights under the CMPA. He knocked at that door. By the time he knew what had happened... Are you saying he had no rights or he was given no rights? I'm saying both. Well, they're two different things. Yes. You can't complain about not being given something you don't have. Well, he... I think as a matter of law, as we've discussed at some length today, he had no actual rights because the actions taken were all RIF-related or did not cause him, if taken, if atomized, right? Step two caused no harm. But if he's being caught up in the RIF and if the RIF itself gives some administrative appeal right, why didn't he pursue that? It doesn't. There are a couple of... My colleague mentioned some appeal rights, none that are relevant to Mr. Thompson. Well, why the caveat on your part? Which caveat? None that are relevant. Oh, I'm afraid I don't remember what that carve-out was. Okay. So doesn't the RIF legislation itself say you can, within 30 days, come bring an administrative challenge? Yes. 1-625.5. And so why wasn't that pursued? Well, it was. The right before OEA was to contest that the separation procedures of subsections D and F were not properly applied. The separation procedures in the specific language of D and F were properly applied. The problem was that he was in a position that he shouldn't have been in, so to speak. Outside of that. So the narrow scope of that just was non-responsive to the situation he faced. Correct. That's helpful. So here, Mr., can I say, he was damned if he did and damned if he didn't. He had no remedy other than this suit. And the district has found lots of technical reasons for finding that it's not going to be held responsible. But at core, what the district did was wrong. It happened because of Mr. King's final policymaking authority. But for that authority, this never would have happened. And therefore, the district should be liable. Thank you very much. The case is submitted. Thank you.
judges: Millett, Pillard, Wilkins